Statement of the Case.
MONROE,, C. J.
Plaintiff has appealed from a judgment rejecting his claim, on behalf of his minor child, for damages for personal injuries alleged to have been sustained by the child through the negligence of defendant’s servants.
The minor is a girl who, at the time of the accident out of which this suit has arisen, was about 15 years of age, and had an engagement to sing during the evening exhibitions of a moving picture show. The family lived on the woods side of Laurel street, between Cadiz and Valence, and at about 4:45 p. m. on February 22, 1914, the girl walked to the lower, river side, corner of Cadiz street carrying in her hand “a small cane grip,” and hailed a downtown car in order to be conveyed to the show. The car stopped, and, according to her testimony, she placed the grip on the platform, and attempted to get on, when the conductor rang the bell and the car started, throwing her, face down, on the platform, with her lower extremities extending outward over the step. She says:
“The car stopped entirely, and I made an attempt to get on, * * * and, just as I had one foot on the bottom step, the conductor gave the signal to the motorman to start the car, and I was thrown forward into the car. * * * I fell forward on the rear platform, * * * on my left side. * * * Q. Now, as I understand you to say, you put your right foot upon the step? A. Yes, sir. Q. And you fell upon the platform, on your left side? A. Yes, sir. Q. You were still resting your weight on your left foot, on the ground, were you? A. No, when I fell, of course, my left foot came up off the ground; but, until I fell, I was resting it on my left foot. Q. At the time the conductor gave the signal for the car to start, you were resting your weight on your left foot, on the ground? A. Yes, sir. Q. Did you have hold of anything — any part of the car — to help you getting on the car? A. No, sir; I had put my little grip on the platform, of course, like any one would, getting on the car; I held on the sidepiece (referring to the grabiron). That was the way I got on the car. * * * I got up with my right foot and put my grip down and took hold of the grabiron with my right hand. * * * Q. Did you fall on your knees on the ear? A. No, sir; I fell flat on my stomach on the car. Q. You fell flat on your stomach on the car? A. Yes, sir; my feet were sticking out, back, and I was lying on the back platform with my feet halfway out of the back of the car when I fell. * * * The conductor did not make any attempt to pick me up when I fell. I got up myself.”
She further testifies that, after she had arisen and taken her seat in the car, she felt dizzy and “sort of sick,” but that she went on to the show, where she arrived at about 5 o’clock, or a little after, and “just like, fell on the seat”; and that she complained to the manager, but that she “went on and worked one show” (meaning that she sang during one of the exhibitions); that she then felt unable to go on and sing during the second exhibition, as she had been accustomed to doing, and requested the manager to send for her father to come and take her home, which he did; and that she left the show at 8:30, instead of 10, o’clock, which latter was the usual hour; that a physician was called and advised that she go to bed, which she did, and remained there four days, but “was not fully recovered from the fall until about two *685 weeks afterwards,” since which she gets pain in her side if she walks too fast, and is unable to dance as much as she did.
The manager of the show corroborates the minor, in so far as her testimony relates to the occurrences at the show; says that she complained of pain in her side, that he excused her between 7 and 8 o’clock, and that he believes that her father came and took her home.
The physician who was called testifies that he found his patient suffering with severe abdominal pain in the region of the kidneys, and “in a very nervous condition, almost on the verge of convulsion” ; that she also had a bruise, or abrasion, on one ankle; that, two or three days later, he examined her urine 'and, finding blood, became satisfied that her kidneys had been injured; that he had her under observation for a little more than a month. Being asked whether he considered her injury permanent, he replied:
“Well, from an examination that I made of •her urine, I found albumen. That is not a very-good sign of permanently being cured, and there may be some injury to the kidney which will show up later; but, on the last examination, it was a very small amount of albumen, and I could not say, because I have not made any recent examination of the urine, and I don’t know what I would find.”
Mrs. Sehernbeck (the girl’s mother) testifies : That she lived (at the time of the occurrences here in question) on the other side of Laurel street (from that on which her daughter boarded the car), between Cadiz and Valence, and was standing at her gate when it happened. That she (the daughter) “got on the car; she didn’t get completely on the car; didn’t have a chance. She fell before she did. * * * Well, she got on the car. I could see from the corner. One half was on the car, and the other half hanging. The car went off. Of course, I couldn’t see any more.”
Mildred Lott, Mrs. Schernbeck’s sister, who is shown to have been about nine years old at the time of the accident, testifies, in part, as follows:
“Miss Olara was standing, waiting for the car, and the car came and stopped for her. She put her right foot on the car, and the car went off and she fell frontwards, and one part of her body was in and one part out. The car went off, and that was all that I seen. * * * She went just to put her right foot on, and I think he rang the bell, and the car went right off and she fell in, just when she put her right foot on * * * the step. * * * She fell frontwards, tried to hold herself, and the car gave a jerk, and she fell frontwards. * * • I was standing right there talking to Miss Clara Bell when she put her foot. I started skating along. I was skating on the pavement, and that is how I came to see it. And I skated off when the car started going down; I started along with the car. * * , * She put her foot on the caí-, and then he rang the bell right after. * * * Q. Now, you say that you saw Miss Sehernbeck put her right foot on the step? A. Yes, sir. Q. She was then standing with her left foot on the ground, I suppose? A. Yes, her left foot on the ground and her right foot on the step. Q. And the car went ahead, then, while she was in that position? A. Yes, sir. Q. And she fell upon the platform of the car? A. Yes, sir; half was in and half was out. * * * Q. Did you see her' when she got up from that position? A. No, sir; the ear went off; the car kept agoing. A. And you state you skated alongside of the car? A. Yes, sir; I skated half of the block; yes, sir. Q. Of course, you couldn’t keep up with the car; had she got up when she got halfway down the block? A. No, sir; she was ready to get up when she got halfway the block; she was hanging there, trying to get up. I don’t know whether she got up. The car kept agoing, and I didn’t see her any more. Q. Where was that car when you were half the block down; where was the car? A. Oh, why, neax-ly the next — yes, it was nearly the next street, Jena street. * * * Q. And she was still halfway out of the car? A. Yes, sir; she was trying to get up then. Q. Well, of course, you don’t know whether she was trying to get up, or not, as you were not on the car. I ask, did you see her leg sticking out? A. Yes, sir; hanging out. Q. Hanging out or moving around ? A. Moving around; I know she was trying to get up.”
A physician, employed by defendant, was permitted to examine the minor on February 27th (the fifth day after the accident), and he gave a certificate as of that date (verified by his testimony on the trial) which reads:
“I saw patient this a. m.. with Dr. T. J. Kay. Physical examination showed (a) contusion and abrasion of right leg above ankle; (b) alleged pain over region of left kidney. Dr. Kay stated *687 that his patient suffered from concussion of the kidney, with consequent hematuria. He further stated that he found traces of blood in the urine up to the 24th inst. Since that day, the urine has been clear. Dr. Kay said he thought patient was now well.”
Dr. Kay admits that he made the statements thus attributed to him but says that he also stated that he would have to make another examination of the patient’s urine, and that, when he did so, he discovered traces of albumen. He further states that, on her original examination, and subsequently, he found an enlargement, or tumor, in the region of the left kidney, which he attributed to an injury to the “medullary” substance, a circumstance indicative of danger of the development of Bright’s disease. Our conclusion, however, is that the patient had about recovered from the effects of the accident within, say, four weeks after it happened.
Opinion.
[1] Defendant’s learned counsel, once or twice, asked questions, and in the course of his oral argument used expressions, which convey the idea, evidently shared by him, that, in order for the minor to have fallen upon the platform, from the position in which (in her testimony) she places herself when the ear started, a lifting of her body would have been necessary, and hence that such a “fall” would have been impossible. Thus, he asked the minor, “And you fell upon the platform,” etc.; and, in' the brief, which has been filed, we find the following:
“If plaintiff were standing, resting her weight on her left foot, having just put her right foot on the step of the car, and was grasping the handle bar when the car was started, she would not have fallen, face downward, upward onto the platform, a distance of nearly 30 inches, but would have been pulled forward with the car, and would have fallen on the ground, on her back. * * * If it be true that she was thrown upward and forward onto the platform, with her feet sticking outside the car, how could her ankle have been injured in the fall?”
There is no evidence in the record as to the height of the platform in question, from the ground, and it occurs to us that counsel’s estimate of 30 inches is rather high, being, say, 15 inches each, for the rise from the ground to the step and the step to the platform, whereas we imagine those rises to be about 10 or 12 inches each. However that may be (and we admit that counsel is likely to be the better informed), we have, we will say, a platform 30 inches high, with a single step between its surface and the ground, and which is set back from a given line a distance of, say, 10 inches (being the width of the step), and a girl, of ordinary height, with one foot upon the step and the other upon the ground, in the act of moving forward, up the ascent, and leaving out, for the moment, the factor of the 'application of lateral force, the question is: If she loses her equilibrium, where will she fall? It will be conceded that she will not fall upward, and the basis of counsel’s argument, of the judgment of the district court, and of the impression created, upon the mind of the writer of this opinion (and, perhaps, of other members of this court), is, or was, that it would be necessary for her thus to defy the law of gravitation in order to fall on the platform. Further information and consideration have satisfied us that such necessity would exist only if the platform were higher than, or were removed laterally from beneath, the center of gravity of the falling body, which would not be so in the case stated. In others words, a person standing in front of, and 10 inches distant from, a platform rising to his arm pits, would not, in falling forward, spread his body on the top of the platform; whereas, so standing with relation to, say, a steamer trunk, 30 inches high, and so falling, he would so spread his body, and he would not commit the indiscretion of falling’ upward in so doing, but would fall downward, upon an object in a lower plane. Or, let us suppose that the person were standing upon the second step *689 from the top of an ordinary flight of steps, with the landing, at the head of the flight, rising, perhaps, to the level of his knees; can it be said that, from such position, he could not fall upon the landing, or that, in the event of his body so falling, upon a surface at a lower level, he would be falling upward? We think not; and, so thinking, we conclude that the minor, in this ease, might have fallen on the platform of the car, as she says she did; and that, in so falling, she might have bruised her right leg, and have received a concussion upon her left side, for, if the car moved suddenly at that moment, she might very well, in losing her balance, have bruised her leg against the edge of the platform, and it was her left side that was likely to have come in violent contact with the car, which may be said to have been moving towards it, and away from the right side. Whilst, however, there is no doubt that one’s center of gravity is shifted as one’s body is inclined in one direction or another, and hence that a person who stumbles when leaning forward in the act of ascending stairs is likely to fall forward, and (so far as the stairs are concerned, but not with reference to his center of gravity) upward, it is equally beyond doubt that the tendency to fall forward may be checked, wholly or in part, by a force moving in any other direction; the effect of the application of such force depending upon its strength, the direction from which it comes, and the time of its application.
If the minor, in this ease, had been standing, as people sometimes do when waiting for trains to start, holding the grabiron of her car, with one foot on the ear step and the other on the ground, engaged in conversation with some friend whom she was about to leave, and the car had suddenly started, she would not have fallen at all, if she had let go the grab iron, and if she had held onto the grabiron she would probably have been dragged, and have fallen, in the direction of the moving train, rather than upon or against the steps of the car. But prospective passengers on street cars do not so conduct themselves since electricity has been substituted for mule power. They are trained to “step lively,” and, for the most part, do credit to their training, so that the interval of time that is allowed to elapse between the seizing of the gradiron and the next movement towards getting aboard such a vehicle may be reckoned, at best, in a few flashes of a humming-bird’s wing. In fact, it is inappreciable, and when the learned counsel for defendant assumes, as he appears to assume, that the 15 year old girl whose complaint we are here considering, in testifying that when she put her right foot on the step while resting her weight on her left foot, which remained on the ground, she intended to convey any idea of rest, or stability, he, as we think, misunderstands the situation, which was rather that of a body-in motion, tending to persevere in the direction in which it was moving, than of a body at rest, tending to persevere in its state of rest. As both tendencies disappear, however, when the body is acted on by impressed force, we must consider the starting of the car, as affecting the movement of the minor, because, moving, we think she was. It is undisputed that her “grip” was aboard of it, when the car started, and it is only a question between her and the conductor, whether she had put it on the platform, preparatory to getting on, herself, or whether she had taken it with her. It is evident therefore that she was in motion, and not in anything like a state of rest, and that whether one foot was on the ground, or whether she was then using both feet in the effort to reach the platform, she was in the act of following the grip. If she had already put the grip on the platform, her statement that she then seized the grabiron to *691 assist herself in getting on is reasonable. If, on the other hand, she carried the grip with her, she could have had no hand left for the grabiron, and, in that situation, was entitled to more consideration in the matter of the starting of the car; for, if there is anyone thing more awkward than another, and particularly for those who wear skirts, it is the climbing to the platform of a car with nothing fixed to hold fast to and the aggravation of a grip, held in front, and impeding one’s progress. However that may be, our conclusion is that she started, and acquired a certain momentum, when she put her right foot on the step, and that the impressed lateral force, resulting from the starting of the car, became effective only in so far as that it disturbed her equilibrium after the momentum thus acquired had carried her at least within the confines of the ascending passage leading to the platform which prevented her from being thrown to the ground by reason of any hold that she may have had (but must have released) on the grabiron. The story which she tells of the manner of her fall is corroborated by that of her mother and of the little girl (her niece). The story of the conductor as to that matter, and another is wholly uncorroborated and conflicts in the one case, with itself, and in the other, with the allegations of the answer, which must have been prepared from information furnished by him. Thus, the conductor testifies, at one time, that the minor “went down on one knee. She stumbled over her own grip, and she picked up the grip and walked into the car.”
At another time he was asked, and answered, a question propounded on cross-examination as follows:
“Q. Did you make any effort to assist the •young lady, as she stumbled? A. I just picked up the grip and handed it to her.”
The answer avers that the minor stumbled over a package or grip which she was carrying, “and had placed on the platform of the car, preparatory to getting on the car.”
The conductor testified that she did not place the grip on the platform, preparatory to getting on the car, but brought it with her, dropped it on the platform, and stumbled over it, falling upon one knee.
The mother of the minor must have been 150 feet or more from the point at which her daughter boarded the car, and upon the other side of the street; but we are inclined to think that she might have seen her daughter’s feet extending beyond the dashboard at that distance, and no attempt was made to show that she could not have seen what she testified to or otherwise to discredit her testimony. The little girl, according to her testimony, was on the spot, and her account of the waving of the pedal extremities, while the car was moving from Cadiz to Jena street and beyond, is graphic in the extreme. If she really observed and remembered that the minor put her right foot on the step instead of the left, her faculty of observation must be developed beyond that of 9,999 persons, old or young, out of 10,000; but the other incident may very well have impressed itself upon her mind, as it would upon the mind of any one, not blind, and we do not feel at liberty to say that it was altogether a figment of the imagination.
In addition to the physical injury, the minor complains that a suit of clothing for which she had, but recently, paid $20 (less 2 cents), was spoiled, and that she lost a bracelet for which she had paid $15.
[2] Upon the whole, we are of opinion that she has fairly made out a case of negligence against the defendant; that, as a prospective passenger, she was entitled to a reasonable time within which to get on the car; that she was not allowed it, and thereby suffered personal injuries and other damages; and that defendant is under the legal obligation *693 to make pecuniary compensation for her sufferings.
It is therefore ordered that the judgment appealed from be set aside, and that there now be judgment in favor of the plaintiff John W. Schernbeck, for the use and benefit of the minor, Clara Bell Schernbeck, in the sum of $500, with legal interest from the date of this judgment until paid and all costs.